JS-6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No. CV 25-01052-MWF (CTSx)** **Date: September 18, 2026**

Title: Maha Syed v. UNUM Life Insurance Company of America, et al.

Present: The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

| | |
|---|---|
| Deputy Clerk:<br>Rita Sanchez | Court Reporter:<br>Not Reported |
| Attorneys Present for Plaintiff:<br>None Present | Attorneys Present for Defendant:<br>None Present |

**Proceedings (In Chambers):** ORDER FOLLOWING COURT TRIAL; ENTRY OF JUDGMENT

This dispute concerns the denial of Plaintiff Maha Syed's long-term disability ("LTD") benefits under an ERISA-governed group insurance policy administered by Defendant Unum Life Insurance Company of America. With the Court's approval, Defendant lodged an unredacted copy of the Administrative Record ("AR") with the Court on February 2, 2026. (*See* Notice of Lodging (Docket No. 28)). The parties filed their Opening Trial Briefs on February 10, 2026. (Docket Nos. 30–31). The parties filed their Responsive Trial Briefs on March 10, 2026. (Docket Nos. 39, 41).

Plaintiff also filed a Motion to Exclude Defense Arguments Not Contained in the Denial Letters (the "Motion to Exclude") on February 24, 2026. (Docket No. 32). Defendant filed an Objection to the Motion to Exclude on February 26, 2026 (Docket No. 34), and an Opposition to the Motion to Exclude on March 3, 2026. (Docket No. 36). Plaintiff filed a Reply on March 10, 2026. (Docket No. 40).

The Court read and considered the papers filed in connection with the court trial and the Motion to Exclude and held a hearing on **June 18, 2026**. The hearing was technically styled a "court trial" but was procedurally closer to the review of an administrative record or a hearing on a motion for summary judgment. To the extent it is thought necessary, this Order constitutes the Court's findings of fact and conclusions of law. Fed. R. Civ. P. 52(a)(1).

Defendant's decision to terminate Plaintiff's LTD benefits as of April 12, 2024, is **AFFIRMED**, and judgment is entered in favor of Defendant. Plaintiff failed to

meet her burden of proving by a preponderance of the evidence that she was disabled under the Policy. Moreover, Plaintiff's Motion to Exclude is **DENIED** because the arguments identified by Plaintiff as "new" are either subsidiary to those articulated by Defendant throughout the administrative process or not relied upon by the Court.

## I. FINDINGS OF FACT

### A. Relevant Plan Provisions

Plaintiff was covered by an LTD group insurance policy (the "Policy") offered by Cooley LLP and issued and administered by Defendant. (AR 133).

The Policy, pursuant to the 2006 Policy Endorsement, defines "Total Disability" as "when a disability renders you unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way." (AR 132). The Policy further defines "substantial and material acts" as the duties "normally required for the performance of your usual occupation" which "cannot be reasonably omitted or modified." (AR 132). "Usual occupation" is defined as "the substantial and material acts you are routinely performing for your employer when your disability begins." (AR 132).

Plaintiff falls into Group 6 of the Policy. (AR 135). The Policy contains an "Elimination Period" of 90 days for Group 6. (AR 136). The insured must be "continuously disabled" throughout the Elimination Period before any benefits are due. (AR 148). If found disabled, an insured in Group 6 would be entitled to benefits of 66.67% of her monthly earnings. (AR 137). Based on Plaintiff's position, earnings history, and age, if Plaintiff were found disabled under the Policy, the Policy would provide for a base monthly benefit of $19,166.68 through age 65. (AR 137, 481).

### B. Onset of Symptoms

Plaintiff began working as a corporate lawyer in June 2018. (AR 1694, 1734). On April 25, 2022, Plaintiff moved to a different law firm, Cooley LLP, where she continued as a corporate associate. (AR 65, 1694).

Plaintiff reported that she began to suffer symptoms of "nausea, retching, dizziness, shortness of breath, racing heart, tremors, trouble concentrating, difficulty thinking, remembering, and making decisions, low energy and motivation, anxiety, irritability, become easily and disproportionately upset over minor incidents, gastrointestinal problems, low mood, fear and avoidance of social interactions, sleep disturbances, feelings of sadness and hopelessness, tremors, and loss of interest in activities." (AR 1695). As a result of these symptoms, Plaintiff states that she "could not sustain attention on [work] tasks and therefore had difficulty completing them." (AR 1695).

On May 15, 2023, Plaintiff met with Dr. Leslie Ann Bae Michel and discussed her nausea symptoms. (AR 271). Plaintiff also met with therapist Kimberly Brooks, LCSW, who thereafter diagnosed Plaintiff with generalized anxiety disorder and a "[s]evere episode of recurrent major depressive disorder." (AR 275–76). Then, and at follow-up appointments, Ms. Brooks recounted Plaintiff's reports of difficulties at work, career stress, and personal stressors associated with living at home with her parents and siblings. (AR 275–92).

Plaintiff states that, due to her symptoms and after discussion with Ms. Brooks, she could no longer competently represent her clients. (AR 1695–96). Plaintiff then took a leave of absence from Cooley on May 22, 2023. (AR 1695–96, 64).

### C. <u>Initial Approval of LTD Benefits</u>

Plaintiff submitted a claim for LTD benefits to Defendant in August 2023, stating that she had become disabled from working as a corporate lawyer in May 2023 due to "Major Depression" and "Chronic and Generalized Anxiety Disorder." (AR 105–10).

After receiving Plaintiff's claim, Defendant requested an Attending Physician Statement ("APS") from Ms. Brooks. (AR 113). On the APS, Ms. Brooks reported the depression and anxiety diagnoses and explained that Plaintiff had "behavioral health limitations" that "impede her ability to fully complete her roles and responsibilities." (AR 121–23). Ms. Brooks listed some physical symptoms including

"drowsiness, fatigue, nausea, [and] mental fog" but described them as "medication side effects." (AR 122). She advised that Plaintiff "should remain off work until mood better stabilizes [and] medication is properly managed without negative side effects." (AR 122).

Plaintiff further described her symptoms in a call with Defendant on August 31, 2023. (AR 178). On the call, Plaintiff explained that "she has trouble getting out of bed" and that she would experience "nausea or stomach aches [and] elevated heart rate before having to make calls or have a meeting." (AR 179). An employee at Cooley confirmed that the "firm did see a noticeable decline in [Plaintiff's] performance in the months leading up to her [leave of absence]." (AR 258).

Defendant also obtained Plaintiff's treatment records from May 2023 through October 2023, including records from Ms. Brooks, Dr. Michel, psychologist Dr. Jaclyn Bauer, and psychiatric nurse practitioner ("NP") Megan Puyau. (AR 269–94, 344–411, 434–63). NP Puyau began treating Plaintiff in July 2023 due to "worsening depressive and anxious symptoms." (AR 402–03). NP Puyau recorded Plaintiff's behavioral symptoms but identified normal cognitive functioning in each of her mental status examinations. (AR 357, 377, 395). Plaintiff continued to make adjustments to her medication during this period, which included fluoxetine (Prozac) and bupropion (Wellbutrin) for depression, Vyvanse for ADHD, and Mounjaro for weight loss. (AR 348–49, 413).

Based on these sources, Defendant approved Plaintiff's claim on October 20, 2023 for her "conditions of major depressive disorder and generalized anxiety disorder." (AR at 480, 483).

### D. Post-Approval Developments

Defendant continued to seek updated information concerning Plaintiff's condition. (AR 497, 503). On November 2, 2023, via phone call, Plaintiff reported that her symptoms of fatigue and lack of motivation had not improved, and that her providers had continued to adjust her medications. (AR 497).

Defendant received updated records from NP Puyau for October and November 2023. (AR 515–49). On November 17, 2023, NP Puyau reported an improvement in psychiatric symptoms, including "improved" sleeping, that "her anxiety symptoms have decreased in intensity," and that, when she took Vyvanse, "her energy level [was] normal." (AR 519). NP Puyau continued to report normal cognition results on Plaintiff's mental status examinations. (AR 520, 530, 538, 543–44).

On January 18, 2024, Defendant's vocational analyst Thomas Waymire performed an analysis of Plaintiff's position as a corporate associate. (AR 637–38). Waymire described the "Mental & Cognitive Demands" of the position as "directing, controlling, or planning activities of others," "influencing people in their opinions, attitudes, and judgments," "making judgments and decisions," and "dealing with people." (AR 638).

Defendant received further records from NP Puyau on March 12, 2024, as well as a treatment summary from Plaintiff's new mental health provider, Savannah Varela, MSW, LCSW. (AR 693–766, 802). During a consultation with NP Puyau on March 1, 2024, Plaintiff reported that "her depression and anxiety symptoms remain[ed] stable and manageable." (AR 701). She also reported that she had been referred to a cardiologist and that she had a stress test completed, which was "inconclusive" as to Postural Orthostatic Tachycardia Syndrome ("POTS"), "but indicated autonomic dysfunction." (AR 702).

Ms. Varela reported that she had conducted numerous virtual psychotherapy sessions with Plaintiff between October 2023 and March 2024, and opined that Plaintiff was "not advised nor ultimately able to return to her previously held employment position" because of persistent symptoms including "[e]xtremely low energy," "general malaise," "chronic exhaustion," "nausea," and "[p]ersistent symptoms of biopsychosocial and emotional burnout related to . . . the indicated professional position and workplace culture." (AR 802–03).

### E. Defendant's File Review and Termination

In April 2024, Defendant referred Plaintiff's file to psychiatrist David Rosenthal, M.D. Dr. Rosenthal asked NP Puyau and Ms. Varela whether they agreed with him that evidence did not support Plaintiff's continued inability to perform the full-time cognitive demands of her usual occupation. (AR 888–94). NP Puyau checked the option indicating agreement (AR 917), and Ms. Varela indicated disagreement. (AR 923–24). Plaintiff later submitted a letter from NP Puyau stating that she had "mistakenly" affirmed agreement with Dr. Rosenthal's opinion. (AR 1175).

Dr. Rosenthal concluded that ongoing disability was not supported. (AR 922). He noted that, aside from mood reports ranging from "low" to "average" to "good," NP Puyau's appointment notes consistently documented "unremarkable" mental status examination findings. (AR 923). He further stated that NP Puyau's notes from November 2023 onward reflected improving symptoms as well as functional activity inconsistent with work-preclusive impairment. (AR 923). Dr. Rosenthal also noted that Plaintiff's level of care was consistent with maintenance of "an adequately controlled mental disorder" rather than "a severe and impairing psychiatric illness." (AR 923). Finally, Dr. Rosenthal concluded that Plaintiff's condition was "related to work stress," and while Plaintiff "may choose not to return to a specific workplace due to a stressful environment, evidence that she could not perform her occupation at another employer is lacking." (AR 923).

Defendant also referred the file to psychiatrist David Marino, M.D. Dr. Marino similarly concluded that the record did not support work-preclusive impairment, noting the documented "significant and sustained improvement in symptoms by the period under review" and the "unremarkable" mental status examinations. (AR 931–32).

Based on the updated record and file reviews, Defendant determined that Plaintiff was no longer disabled and terminated benefits effective April 12, 2024. (AR 942–51). Defendant concluded that NP Puyau and Ms. Varela's opinions on the functional impact of Plaintiff's psychiatric condition were not substantiated by any particular documented observations or mental status examinations. (AR 944).

Defendant also cited Plaintiff's level of activity, treatment intensity, and documented improvement in symptoms. (AR 945–46).

Plaintiff disputed the denial and requested that Defendant review additional materials from Ms. Varela. (AR 968). Ms. Varela provided a more detailed summary of her sessions with Plaintiff. (AR 980–81). Dr. Rosenthal and Dr. Marino reviewed the additional information and concluded that it did not change their prior opinions because the record still did not contain mental status exam findings or specific observations. (AR 995, 999). Defendant thus declined to change its claim determination. (1005–09).

### F. Plaintiff's Appeal

In October 2024, Plaintiff appealed Defendant's denial of benefits. (AR 1031–81). In the appeal, Plaintiff maintained that she remained disabled "due to Major Depressive Disorder and Generalized Anxiety Disorder secondary to Dysautonomia." (AR 1033). The appeal included an independent evaluation from neurologist David Saperstein, M.D., letters and records from treating providers, and narrative statements from Plaintiff, her friend, and her sister. (AR 1142–47, 1169–76, 1694–1724).

Dr. Saperstein had evaluated Plaintiff via telehealth on September 19, 2024. (AR 1037, 1142). In his report, he recounted Plaintiff's symptoms and noted she had been evaluated by a cardiologist who diagnosed her with dysautonomia. (AR 1142–44). The cardiologist ordered a "tilt table test" and echocardiogram conducted, which were both "within normal limits." (AR 1142, 1144). Still, Dr. Saperstein reviewed the underlying data of the tilt table test and concluded that Plaintiff nevertheless met the diagnostic criteria for POTS. (AR 1145). He noted her symptoms of "[f]atigue, intolerance of being upright, and impaired concentration." (AR 1145). Dr. Saperstein also concluded that, in addition to POTS, Plaintiff met the criteria for "Chronic Fatigue Syndrome/Myalgicencephalomyelitis (CFS/ME), which can produce symptoms that can be mistaken for depression and anxiety." (AR 1037, 1145). Dr. Saperstein noted that Plaintiff's "[s]peech and mental status [were] unremarkable with a conversation" and that her "[a]ffect was appropriate." (AR 1144).

Plaintiff's cardiologist, Dr. Megha Agarwal, also submitted a disability opinion. (AR 1169–70). Dr. Agarwal opined that Plaintiff was disabled from her occupation due to dysautonomia and POTS-related symptoms. (AR 1169–70). Dr. Agarwal noted that Plaintiff's tilt table test results indicated an "overall hemodynamic response . . . at the upper limit of normal." But Dr. Agarwal emphasized that Plaintiff's "symptoms of lightheadedness, blurry vision, weakness in her legs, and shortness of breath . . . significantly impact[ed] her daily functioning." (AR 1169). Dr. Agarwal stated that Plaintiff experienced certain cognitive limitations including fatigue, dizziness, and mental fog. (AR 1169). Dr. Agarwal also stated that simple physical activities such as bending over and prolonged standing or sitting could trigger "nausea, dizziness, and shortness of breath." (AR 1169).

Plaintiff's primary care physician, Dr. Jonathan Rosaasen, also submitted a statement in support of disability due to "severe and unpredictable symptoms caused by Dysautonomia." (AR 1173). And NP Puyau submitted a letter concluding that "based on her mental health/psychiatric symptoms secondary to Dysautonomia," Plaintiff could not return to work in her own occupation. (AR 1175). NP Puyau also noted that her earlier agreement with Dr. Rosenthal had been mistaken. (AR 1175). Ms. Varela submitted a letter stating that Plaintiff's symptoms were unpredictable and easily triggered by simple physical activities. (AR 1171–72).

Plaintiff's personal narrative described her symptoms, functional limitations, and treatment history. (AR 1694–1703). It also addressed social activities that Defendant identified, including Super Bowl and New Year's Eve gatherings. (AR 1701–03). Plaintiff stated that her involvement in these events was limited and she spent most of that time in her room. (AR 1703).

### G. <u>Defendant's Appeal Review</u>

Defendant arranged for the appeal materials to be reviewed by a nurse consultant and various physician consultants. (AR 1778–86, 1818–22, 1858–61). Dr. Zachary Gross, an internal medicine physician, reviewed the file and concluded that work impairment since April 2024 was not supported. (AR 1818–22). He noted that Plaintiff's cardiac monitor, echocardiogram, and stress tests were normal. (AR 1822).

He also noted that on March 15, 2024, Plaintiff reported that her heart rate was better with Propranolol and that she had started using a rowing machine. (AR 1822). Dr. Gross further observed that psychiatric evaluations from January 25 to March 1, 2024, documented Plaintiff as "alert and oriented, with good attention, good judgment, and good insight." (AR 1822). He noted the autonomic testing, including the tilt table test, but explained that it "documented no definite generalized autonomic impairment." (AR 1822). Dr. Gross concluded that, considering Plaintiff's reported symptoms, clinical and exam findings, treatment intensity, and reported functional activities, the evidence did not support work-preclusive impairment. (AR 1822).

Dr. Jon Deam, a psychiatrist, also reviewed the appeal materials in November 2024. (AR 1858–61). Dr. Deam noted that Plaintiff's mental status examinations were normal, and that by March 1, 2024, depression and anxiety symptoms were noted to be stable. (AR 1860). As to dysautonomia, Dr. Deam stated that cardiology visits reflected variable heart rate and blood pressure, but normal cardiovascular examinations and that treadmill testing, stress testing, and echocardiogram monitoring were all normal. (AR 1860). He concluded that work-preclusive impairment was not supported because Plaintiff's treatment was instead "consistent with a chronic condition with fluctuating but predominantly mild to moderate symptoms that appear[ed] largely stable by the date in question." (AR 1860).

Defendant then provided Plaintiff with a "Right to Review and Respond" package, including the reports of Dr. Gross and Dr. Deam. (AR 1879–1957). Plaintiff then submitted supplemental letters in response, including from NP Puyau, Ms. Varela, Dr. Agarwal, and Plaintiff herself. (AR 1978–81, 2010–17 2011, 2016, 2021–28, 2033–34). Some of these letters arrived after Defendant's final determination, but Defendant responded that the additional materials did not add new clinical evidence or opinions not previously considered. (AR 2019, 2036).

Defendant upheld its claim determination on appeal on January 6, 2025. (AR 1995–2003)

## II. CONCLUSIONS OF LAW

### A. Legal Standard

#### 1. Rule 52(a)

Federal Rule of Civil Procedure 52 provides that "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "In a Rule 52 motion, as opposed to a Rule 56 motion for summary judgment, the court does not determine whether there is an issue of material fact, but actually decides whether the plaintiff is [entitled to benefits] under the policy." *Prado v. Allied Domecq Spirits and Wine Group Disability Income Policy*, 800 F. Supp. 2d 1077, 1094 (N.D. Cal. 2011) (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999)). In making that determination, the court must "evaluate the persuasiveness of conflicting testimony and decide which is more likely true" in order to make findings of fact that will be subject to review under a clearly erroneous standard if appealed. *Kearney*, 175 F.3d at 1095.

#### 2. ERISA Standard of Review

The Policy is governed by ERISA, which provides the exclusive remedy for Plaintiff's claim. *See* 29 U.S.C. § 1132(a)(1)(B).

The parties stipulated that the Court shall review the claim *de novo*, giving no deference to the claim administrator's decision and instead making its own merits determination based on the information contained in the Administrative Record. (*See* Order Granting Stipulation (Docket No. 20)); *Muniz v. AMEC Construction Management, Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010) (discussing the de novo standard).

On *de novo* review, the claimant bears the burden of proving entitlement to benefits. *Muniz*, 623 F.3d at 1294. To prevail, Plaintiff must prove that she was "more likely than not" disabled under the terms of the Policy. *See Gallegos v. Prudential Ins. Co. of Am.*, No. 16-CV-01268-BLF, 2017 WL 2418008, at *1 (N.D. Cal. June 5,

2017); *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1163 (9th Cir. 2016) (standard of proof in *de novo* ERISA disability claim is preponderance of the evidence). Eligibility for benefits depends on the terms of the Policy, which must be enforced as written. *Heimeshoff v. Hartford Life & Accident Insurance Co.*, 571 U.S. 99, 108 (2013) (citing 29 U.S.C. § 1102(a)(1)).

## B. DISCUSSION

### 1. Motion to Exclude

As a threshold matter, Plaintiff asks the Court to disregard certain defense arguments under *Collier v. Lincoln Life Assurance Co. of Boston*, 53 F.4th 1180 (9th Cir. 2022), and *Harlick v. Blue Shield of California*, 686 F.3d 699 (9th Cir. 2012). (*See generally* Motion to Exclude; Plaintiff's Opening Brief at 19). Plaintiff is correct that in *Collier* the Ninth Circuit held that a district court "clearly errs by adopting a newly presented rationale" when reviewing a denial of benefits that the insurer did not raise during its administrative processes. 53 F.4th at 1188. The *Collier* rule prevents the claimant from being sandbagged by post hoc rationales that the claimant had no opportunity to address. *See id.* at 1188–89.

However, the Court has not relied on any new rationale within the meaning of *Collier* in its analysis. The arguments and evidence on which the Court relies — as discussed below, the lack of substantiated functional restrictions, the largely unremarkable test results, the documented improvement in psychological symptoms, and the degree to which Plaintiff's later opinions depend on subjective reports — were either identified explicitly in Defendant's denial letters or are fairly considered subsidiary to the same rationales so identified. (AR 942–47, 1005-09, 1995–2003).

Those rationales are not "new" within the meaning of *Collier* because they "are merely subsidiary to a pre-litigation rationale" asserted in the insured's denial. *Mendoza v. First Unum Life Ins. Co.*, No. 25-3080, 2026 WL 2295887, at *2 (9th Cir. Aug. 10, 2026); *see also Beach v. Liberty Life Assurance Co. of Bos.*, 763 F. App'x 601, 602 (9th Cir. 2019) (distinguishing between "some new factual arguments" from an entirely new reason for denial); *R. R. v. California Physicians' Serv.*, No. 24-6337,

2026 WL 207507, at *5 (9th Cir. Jan. 27, 2026) (explaining that "an administrator may cite evidence in litigation that it had not cited during the administrative process, so long as the evidence supports the same underlying legal theory"). To the extent Plaintiff identifies other stray arguments in Defendant's briefing that she contends are new rationales, the Court has not relied on those arguments below.

Accordingly, the Motion to Exclude is **DENIED** as to the arguments on which the Court relies and **DENIED *as moot*** as to any challenged arguments on which the Court does not rely.

**2. Entitlement to Benefits**

As for the merits of her claim, Plaintiff has not carried her burden, by a preponderance of the evidence, that she remained unable to perform the substantial and material acts of her usual occupation when Defendant terminated benefits effective April 12, 2024.

The Court begins with the evidence closest in time to that determination. While later medical diagnoses or assessments should not be disregarded solely because they are retrospective, *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988), any "physician's opinion is more credible when supported by medical and vocational evidence of contemporaneous functional limitations." *Dever v. Lincoln Nat'l Life Ins. Co.*, No. 2:24-CV-02435-DJC-JDP, 2026 WL 880238, at *8 (E.D. Cal. Mar. 31, 2026). Here, where the later opinions must be reconciled with contemporaneous clinical findings, those contemporaneous findings are the most persuasive evidence of Plaintiff's functional condition when benefits were terminated. *See Sanchez v. Hartford Life & Accident Ins. Co.*, No. CV 20-03732-JWH (JEMx), 2022 WL 4009176, at *6 (C.D. Cal. Sept. 2, 2022).

Those records reflect that Plaintiff's initial work impairment was principally behavioral in nature. Plaintiff's initial claim identified depression and anxiety as the disabling conditions. (AR 108, 121). Treatment notes from Ms. Brooks and NP Puyau document significant depression and anxiety, but also repeatedly connect Plaintiff's symptoms to workplace stress and difficult personal and family circumstances. (*See,*

*e.g.*, AR 275, 279, 281, 290, 353–54, 449). True, physical symptoms including nausea and dizziness were not wholly absent from the contemporaneous record. But before April 2024, no provider identified a physical condition as an independent basis for work-preclusive limitations. Indeed, several early reports of nausea were attributed to possible medication side effects, especially from Mounjaro. (*See, e.g.*, AR 365, 393).

Moreover, the treatment records reflect the stabilization and improvement of Plaintiff's symptoms: Plaintiff reported decreased depression symptoms in December 2023, reduced sadness and irritability in January 2024, and "stable and manageable" depression and anxiety in February and March 2024. (*See, e.g.*, AR 701, 711, 730, 739). NP Puyau also recorded fair concentration, adequately managed attention, and largely normal mental status examination findings. (AR 701–03, 712–13, 730–32, 739–41).

Dr. Rosenthal and Dr. Marino then persuasively concluded that this contemporaneous record was inconsistent with continued work-preclusive impairment, noting the largely unremarkable mental status findings, the improvement of symptoms, and inconsistency in level of treatment. (AR 921–24, 930–32).

Plaintiff emphasizes that Dr. Rosenthall and Dr. Marino, as well as Defendant's later consultants, should be discounted because they conducted file reviews and did not examine Plaintiff in person. (Plaintiff's Opening Trial Brief at 20–22). However, "[c]ourts are not obliged to accord special deference to examining physicians over non-examining physicians." *Mendoza*, 2026 WL 2295887, at *1 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003)). That rule is particularly forceful here, where much of Plaintiff's own evidence is from physicians who themselves could not meaningfully be described as "treating providers." Dr. Saperstein, for example, based his opinion on a telehealth interview and his review of Plaintiff's records (AR 1144), and it does not appear Dr. Rosaasen ever personally examined Plaintiff. (*See* AR 1343, 1346).

And just as the Court cannot categorically discount Defendant's physician reviewers, it cannot overly credit Plaintiff's treating providers. *See Nord*, 538 U.S. at 834. "[A] treating physician's diagnosis can be discounted when it lacks supportive

evidence, it is contradicted by other statements and assessments of medical condition, and it is based upon subjective descriptions of pain or limitations." *Sanchez*, 2022 WL 4009176, at *6; *Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1129–30 (C.D. Cal. 2015).

Here, nothing in Ms. Brooks's records provide specific observations, functional assessments, or mental status examination findings that persuasively demonstrate that Plaintiff lacked the ability to perform corporate legal work as of April 2024. NP Puyau's later opinion that Plaintiff could not return to work must be weighed against her contemporaneous records reflecting stabilizing symptoms and largely unremarkable mental status examination findings. (AR 701–03, 711–13, 1175). And although Ms. Varela opined that Plaintiff should not return to her prior position, she did not provide detailed treatment notes, mental status examinations, or functional assessments that corroborated a work-preclusive condition. (AR 802–03, 980–81); *Sanchez*, 2022 WL 4009176, at *6–7 (explaining the circumstances under which a treating physician's diagnosis can be discounted for lack of support); *Mendoza v. First Unum Lie Ins. Co.*, No. 3:24-CV-00834-H-VET, 2025 WL 1393871, at *10 (S.D. Cal. May 5, 2025), *aff'd,* No. 25-3080, 2026 WL 2295887 (9th Cir. Aug. 10, 2026) (affirming denial of benefits where "no further explanation or support [was] provided" for treating mental health provider's conclusions and they were "not supported by [the provider's] mental status exam from the month prior which was unremarkable aside from dysthymic mood").

Plaintiff's later materials, including on appeal, indeed reframe her claim as one involving depression and anxiety secondary to the physical conditions of dysautonomia and POTS. However, these materials do not change the outcome here. While the Court does not question that later-identified diagnoses may prove or explain earlier disability, *Smith*, 849 F.2d at 1225–26, the bare fact of any diagnosis is, standing alone, insufficient to establish disability. *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004) ("That a person has a true medical diagnosis does not by itself establish disability."). Plaintiff must still connect the dots, so to speak, between any diagnoses and actual functional limitations that rendered her disabled under the Policy in April 2024. She has not done so.

Dr. Saperstein's report in particular has limited persuasive force on this question. Dr. Saperstein evaluated Plaintiff via telehealth in September 2024 and opined that she was severely disabled by POTS and CFS/ME. (AR 1142–46). While he concluded that Plaintiff's tilt table test results were consistent with POTS, he did not persuasively reconcile that conclusion with the administering electrophysiologist's description of those results as "at the upper limit of normal." (AR 1217). And although Dr. Saperstein considered Plaintiff's cardiologist records (AR 1144), there is no indication that he reviewed or considered the contemporaneous evidence considered by Dr. Rosenthal and Dr. Marino which suggested that Plaintiff's medical leave was the result of a particular mental health episode, such as the reports of Ms. Brooks and NP Puyau. (AR 922–23, 931–32).

As to Dr. Agarwal, although she reported Plaintiff's symptoms of fatigue, dizziness, and mental fog (AR 1169–70), she also reported normal results from Plaintiff's stress test and echocardiogram, and agreed that the results of the tilt table test were at the upper limits of normal. (AR 1169, 1181). So beyond Plaintiff's "subjective descriptions of . . . limitations," the basis of Dr. Agarwal's and Dr. Saperstein's later disability opinions is unclear and cannot be given much weight. *See Sanchez*, 2022 WL 4009176, at *6; *Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1130 (C.D. Cal. 2015) ("[T]he more detail a physician provides concerning the bases for his or her diagnosis and opinion, the more weight his or her conclusions are afforded.").

Plaintiff's narrative and the statements of her sister and friend likewise do not alter the balance of evidence. Those statements indeed support that Plaintiff experienced symptoms including social withdrawal. (AR 1694–1703, 1720–24). They also reduce the force of Defendant's arguments relying on Plaintiff's appearance at certain social gatherings. But these narratives also "present a significant potential for bias" and cannot, on their own, assess work-preclusive cognitive or functional impairment, especially when weighed against a medical record of unremarkable exam results and a lack of specific medical observations. *See Shaw*, 144 F. Supp. 3d at 1135–36 (explaining that, in addition to bias concerns, such lay narratives are unable "to assess . . . functional capacity in the way individuals trained in the medical field

can" and "do not compensate for the fact that there is insufficient medical evidence of functional disability in the record"); *Mendoza*, 2025 WL 1393871, at *14.

Finally, Plaintiff argues that Defendant's denial must be overturned because some reviewers referred to Plaintiff's potential ability to work a less demanding job than corporate practice at Cooley. (Plaintiff's Opening Trial Brief at 19–20). But the Court's analysis does not turn on this premise. It rests on the governing Policy standard, which defines "usual occupation" as the substantial and material acts Plaintiff was routinely performing for her employer when her disability began. (AR 132); *see also Radmilovich v. Unum Life Ins. Co. of Am.*, 701 F. Supp. 3d 984, 999 (C.D. Cal. 2023) (applying materially similar language and requiring consideration of the claimant's actual occupational duties). Applying that standard, the record does not establish by a preponderance of the evidence that Plaintiff had a disability preventing her from performing the "substantial and material acts" she was performing at Cooley as of April 2024 — at Cooley or elsewhere.

Accordingly, Defendant's decision to terminate Plaintiff's LTD benefits is **AFFIRMED**.

## III. CONCLUSION

Defendant's decision to terminate Plaintiff's LTD benefits as of April 12, 2024, is **AFFIRMED**, and judgment is entered in favor of Defendant. Moreover, Plaintiff's Motion to Exclude is **DENIED**.

IT IS SO ORDERED.

This Order shall constitute notice of entry of judgment pursuant to Federal Rule of Civil Procedure 58. Pursuant to Local Rule 58-6, the Court **ORDERS** the Clerk to treat this order, and its entry on the docket, as an entry of judgment.